May it please the Court. My name is Don McClay, and I represent Kelly Ryan and its marine underwriters in this matter. Before you get started, counsel, we faxed out an order late yesterday afternoon. I did receive it, and that's the initial thing I was going to discuss, as I assumed that was somewhat important to the Court. We just wanted to make sure that you were aware of that case, because it wasn't mentioned in the case. At this point in time, I'd like to reserve five minutes to provide any insight about that. First of all, the Court's order discussed the relationship between the Supreme Court's decision in Kirby and the Ninth Circuit's decision in Simon. I guess the answer is two-part, what Kirby did to Simon. Kirby did not overrule the holding that Simon was cited in our briefs today, that holding being that the policy of insurance, ensuring employees' acting and loading and unloading of vessels is not running insurance. Kirby, as the Court's aware, dealt with the movement of goods from Australia to the United States. The majority of that was going to be moved on a boat. The inland portion was going to be done by train. Counsel, would you please speak up? Okay. I'm sorry. The majority of it was going to be done by boat. The balance on the inland portion was going to be done by train. As the Court's aware, this is a maritime case about a train wreck. The Court determined that the bills of lading issued from Australia that covered the entire portion of the goods were maritime contracts. They did not decide what the relationships of those contractors were with their employees or those contractors were with their insurance companies. As an example, if a truck driver was driving goods from overseas, got in a car accident, he would most likely be entitled to state workers' compensation benefits. And the relationship between the employer and his insurance carrier would be governed by state law. Likewise, if a train employee was injured, provisions of that would be governed by FELA, which the Jones Act incorporates. And basically, the relationship between the train, the railroad, and its insurance company would be governed by the law dealing with employers' liability. There would be no argument, absolutely, that that had anything to do with marine insurance. Let me ask you a question about the, you call it the Kirby case, I call it the Norfolk case, but whatever. You mentioned in your brief the Simon case. Correct. That said, there is an incidental exception and a severable exception to the rule that contracts must be wholly maritime in nature to be governed by a federal entity law. Which is the other half of what I was. In light of the Kirby or Norfolk case, does this exception still apply? As I was going to say, that is the other half of what I was planning on saying. Kirby, if it does change the analysis, changes the analysis of what is called mixed contracts. Going back probably to the founding of the Constitution, back to British Admiralty law, there was the idea that for a contract to be cognizable in Admiralty, it had to be wholly maritime. And that if it was part maritime and part land-based, it could not be cognizable on the Admiralty side of the court. As the things developed, two exceptions came up. One being the incidental portion. The other being the severable idea, that if the maritime portion is severable, then it can be cognizable in Admiralty. I believe that Kirby stands for the proposition that you no longer have that rule in determining whether or not the contract is cognizable. The severability issue was negated, if you will, by Kirby. Correct. Basically, what you do now, after Kirby, I think the Second Circuit did the same thing in Folkestone, is you basically take a look at whether the primary purpose of the contract is maritime commerce or not. So we have a primary objective test now. Correct. And that, I mean, once again, I think — I don't think it's overruled all the little rules that we used to determine whether a contract's maritime or not maritime. For example, a contract for marine insurance is maritime. A contract to procure marine insurance is not. A contract to build a ship is not a maritime contract, but a contract to repair it is. I think those distinctions remain intact. Which is what I was saying earlier, that Kirby didn't overrule the distinctions of various maritime contracts. It just changed the test in these mixed contracts. All right. Let me ask the question, if we hold that Admiralty law does not control this case, do we have subject matter jurisdiction over this case in some other way, such as supplemental jurisdiction? Well, as I pointed out in my brief, that obviously the Court would. This case started off as a dispute between the employer's liability carrier and the P&I carrier over who was responsible for this case. The employer's liability took the position that although its policy provided coverage for the case, it basically did not have any obligation because the P&I policy covered it. I'm not sure I'm following you. I thought, was this case, is this a diversity case so that if Admiralty jurisdiction or law does not apply, we still have jurisdiction to decide the unloading issue? Your Honor, I. What gives us the jurisdiction in the first place? The jurisdiction in the first place, as I was trying to explain, is that this was a case about a P&I policy. A case about what? A P&I policy, a protection in the airways policy. Oh, marine protection. It was a marine policy. It was a marine policy, and the issue was whether the marine policy covered the loss. Okay. Now, that's a Federal question jurisdiction you're talking about? It's actually an Admiralty jurisdiction, but yes. Admiralty jurisdiction. Correct, because it's a contract in marine insurance. It came up to this Court one time before.  And that, if you read the decision, is absolutely clear that it's an issue of marine insurance. But what if we don't have Admiralty jurisdiction? Over? You'd say you have Admiralty jurisdiction over some things but not over other things? Correct. What happened was when this case came back, Royal raised a whole bunch of arguments as to why its policy should not have to pay its portion of the claim. When the case was initially filed, there's a declaratory judgment action basically to state the P&I policy did not provide coverage for the case. And that is a maritime question. And as I say, if you take a look at the decision of this Court in that, it is absolutely clear that it was determined under Federal maritime law. But when Royal was added as a defendant, brought into the case, even though if you were to conclude that their policy is not a marine policy, you'd still have jurisdiction over that claim, as Judge Nelson suggested, pursuant to our supplemental jurisdiction. Correct. Supplemental jurisdiction. When the case was initially tried, it was regarding a maritime issue. Royal was added. The Court would retain jurisdiction of everything that arose out of the same events without a question. In fact, Royal is continuing to argue that the P&I policy should be responsible for this loss. So therefore, once again, that issue is maritime, and basically because that issue is being litigated in the Federal courts, anything that is supplemental can also be litigated. Because I'm just sorry to be so obtuse about this, but if something starts out as maritime jurisdiction, and then we determine, well, we really didn't have maritime jurisdiction, if there are other things that naturally or intimately grew out of that under supplemental jurisdiction, we could still hear them, even though there was no basis for Federal jurisdiction. Is that right? Maybe I'm not being clear here. There maintains, when the case was filed, there was an advocacy issue. Jurisdiction. There was jurisdiction over that issue, and it was properly in the Federal court. That Why was it properly in Federal court? Because it was admiralty? Because it was the interpretation of a marine policy of marine insurance, a P&I policy, which is a protection of the marines. Okay. And Federal courts have jurisdiction to decide the meaning of marine policies. Correct. Is that right? Correct. Okay. And that has never fallen out. You take a look at jurisdiction. When the complaint was initially filed, it wasn't that this Court determined that there was no maritime issues. It said that there was maritime issues. Now it can issue decisions on the other things pursuant to the supplementary jurisdiction, if that is making sense. Okay. You're claiming there's both admiralty and supplemental? Is that what your claim is now? Correct. Correct. I mean, if there's admiralty jurisdiction in the first place, then there would be supplemental jurisdiction over everything that arose out of the same. And what do you do with the Norfolk Kirby case, which says the primary objective of the whole contract, and here you have one small portion dealing with maritime? Okay. I guess. And you have no severability anymore. And I totally agree. The Royal Insurance Policy is not a policy of marine insurance. But when you're analyzing jurisdiction, you go back to when the complaint is filed. When the complaint was filed, the issue before the Court was whether or not there was jurisdiction, whether or not the P&I policy, which everyone admits is a marine insurance policy, provided coverage for James Olcotta's laws. Well, I think Justice's question went a little bit beyond that, jurisdiction. That is, if there isn't – putting aside jurisdiction for the moment, under the Kirby opinion, you know, this does not appear – severability doesn't apply anymore. It doesn't appear to be a marine policy. So where does that leave you? Okay. Where does that leave you? Well, basically that leaves us right where we want to be in that the issue of the under Oubre today would be decided in terms of state law. It would not be applicable. And therefore, the Court could not – Royal could not void its policy. How about unloading – loading and unloading? Well, I think – The district court was pretty generous there. In terms of loading and unloading? Yes. As to what is considered loading and unloading? Well, there's two issues. First of all, James Olcotta was employed as a crew member aboard the tug Casey Marie. The Casey Marie towed barges from Seattle to Alaska that contained cargo, including prefabricated homes. When he got to Alaska, he was employed to load and unload those barges. We take a look at the language of the insurance policy. The language of the insurance policy does not require that Olcotta be involved in the loading or unloading operation at the time of his injury. It just requires that his employment be necessary or incidental to loading and unloading. But the prefabricated housing had arrived at the dock, I guess, for lack of a better – I'm not quite sure what was there, the pier, whatever. And it's unloaded from the ship or the barge – Correct. – to land onto this trailer. Okay. Right? Why does that end the story? Well, because if you take a look at the case law, it talks about the completed operation test or the at-risk test. Which case law? Basically, if you take a look at the Washington case law, it talks about – there's the FICUS case. There is the McDonald case, I think it is. They all talk about the different – What were those cases? Were those cases about unloading ships? Those cases dealt with automobile insurance. And whether – Why would we look to that as opposed to cases? And to the, you know, the extrinsic evidence here. Well, it seems to show – it seems to suggest that in the maritime context, you know, unloading – loading is removing it from the ship to the dock where it comes to a rest. Well, once again, I think Kirby is kind of one of those things. Loading – the maritime contract would go from basically the point of pickup to the point of delivery. That is the whole concept. So loading – so unloading means not only removing it from the ship to the dock, but to its actual delivery destination. Correct. What if it was 2,000 miles away and it was put on rail cars to take it into the interior? That still would be unloading? Well, once again, I don't quite see what – I think you're missing the issue, which is what Okada's employment is, whether his employment is necessary to – or incidental to loading and unloading. You're focusing on whether something – if Okada had been injured in the process of something and then the thing was to continue on for 2,000 miles, he still would be involved in loading and unloading because it's his job as a tug crew member, his job as basically getting paid cargo time on a regular basis to load and unload the prefabricated houses. It's not a snapshot test. You don't focus on what he was doing on what he – the time he was injured. You focus on his employment and whether it was necessary or incidental to loading or unloading. Wasn't there a provision in the policy that – and I'm saying it's all wrong, but that once you put the load onto a separate vehicle that was going to carry it away, the unloading had stopped? There is nothing in the Alaska national policy, which is the policy at issue here. It's not the Royal policy. Royal is following phone over Alaska. Where is it? Where is that provision? The only provision I think you can be referring to is something that was cited, and that is in the P&I policy, which was – came up on before, which basically stated that the P&I policy will not provide any coverage after a certain point. So basically what that P&I policy did was define what would be considered vessel operations at the time when its policy would stop. If I want to save the five minutes, I – Let me just ask you – I'll make sure you have a chance to have your time for rebuttal. But is it your contention or not your contention that the term loading and unloading is ambiguous? Well, I think the Washington State courts specifically say the term loading and unloading is ambiguous. And basically, if the Washington – So then what – under Washington law, you take a look at the extraneous evidence, correct? Right. And the extraneous evidence is – Well, you know, if you look at the deposition testimony here from the people who were involved, when they talked about the term of loading and unloading, they gave it a much more narrower – Well, first of all – That is not necessarily true. I believe if you take a look at the declaration of Ryan Place, who was the operator of the vice president of Kelly Ryan, he basically would understand that loading and unloading would extend until the operation was complete. The fact of the matter is that they unload these things and move them to their final location. The fact of the matter once again, though, is whether or not he was actually involved with loading or unloading is not the inquiry this Court should make. The inquiry is whether his employment was necessary or incidental to the loading or unloading. And that's the employment – Okay. Not the employment at the time he was doing what he was doing, but his entire employment with Kelly Ryan. The Ed Boyle offered significant evidence that the terms did not cover Okaiya's activities, but the district court did not appear to even consider that evidence. And since you said yourself the term was ambiguous, why shouldn't that evidence have been considered? Well, I believe that the rule of law should be that if there is a judicial definition of loading and unloading, insurance companies should be bound by that decision as well. That should be what is determined. If Washington courts determine what a term means, then that should be ruled, unless there's evidence indicating that that is not what they intended. But those cases dealt with automobile loading and unloading. They dealt with the term loading and unloading. In the context of automobiles. Well, isn't there a difference between the – you know, I would think there might be some difference between what happens on the dock and what happens on unloading trailers containing vehicles. I don't have any basis for that because I'm not, you know, I'm not a – Right. And once again, as I say, I think the fact of the matter is, under Washington law, you construe ambiguous language against the insurer in favor of coverage. There is no evidence that basically that Kelly Ryan or its brokers ever determined or indicated that they did not believe it was not covered under the Alaska national policy. Okay. Alaska National thought it was covered. They paid the claim. Okay. We'll let you save the balance. Okay. Thank you. Thank you. I'm showing you some colored photographs. I couldn't hear you. I'm sorry. I'd ask – for the record, I'm Mike Helgren. I represent Royal Insurance. And I was asking Mr. McClain if he had any objection to me handing up to you some colored photographs that show these operations, because in the record they're black and white photographs, that might answer some of the questions you've been asking, Mr. McClain, and you might have for me. Just give them to the clerk.  I did, Your Honor. And if I could reserve five minutes to rebutt on the cross-appeal issues. Just do it all at once. All right. I did receive it, Your Honor. Why don't I start there, talking about the Norfolk case. In that case, the principal object of the contract was the protection of maritime commerce, and that's why that was held to be a contract within admiralty jurisdiction. Here, the principal object of the MEL endorsement, which is the portion of the insurance policy on appeal to you, is the protection of employees engaged in maritime commerce. In this regard, according to Century and Lloyds, Mr. O'Connor was a seaman at the time he was injured as a maritime occupation. He was in Alaska because he was assigned to a particular maritime vessel, the KC Marie. He wouldn't have been at the place of injury but for that assignment to that vessel as a seaman. He was hurt, according to Century and Lloyds, in the context of unloading maritime cargo from marine vessels. Those photographs that I passed up to you in no particular order show the prefabricated homes on the barges being pulled to Alaska. They show them being unloaded on the beach. To answer your question, Your Honor, there was not a dock here. This is in the middle of nowhere in Alaska. There is no pier, no wharf. They drop them down there on the sand. You'll see a photograph of that. That particular photograph is not of an Apakiak, but that's a photograph they had of a similar operation. I think there's no dispute in the record. There was no pier or dock here. This was kind of Navy SEAL sort of stuff. You got there to the beach. You had to do a loading area. You unloaded them there. They got dropped on the beach. Then you'll see a photograph of this self-propelled crawler-trailer mechanism. The house gets lifted on a crane onto that. It's driven inland. In this case, it was being driven about a mile and a half inland where Mr. Okada was electrocuted. He was standing on top of it to make sure it cleared the power wires there. That will give you a sense of the operation. All right. If you had known the facts that Kelly Ryan did not disclose, are you suggesting the policy would have been written differently? Absolutely. The premium would have been increased. Mr. Rione, who was the 30B6 witness for Royal, testified in his declaration that in evaluating the risk and setting the premium, I relied on several things. The disclosure that was made about the MBL endorsement, which he thought was limited to loading and unloading Kelly Ryan's own vessels, which in itself is important. They only had two or three vessels. It's quite different to insure somebody who has a limited maritime operation as opposed to insuring, for example, a stevedoring company, which may be unloading 20 or 30 or 40 vessels down here in Seattle. That's one thing that played into the risk. As we pointed out, Century & Lloyds chose not to depose Mr. Rione for good reason. They had all the application materials. They had the letters their broker sent to Royal. Mr. Pleas, who Mr. McLean mentioned to you, is a principal at Kelly Ryan. The evidence is undisputed. He never talked to Royal. He wasn't involved in it at all. Instead, Don Basick, the broker, was. Mr. Basick testified, this is what I thought it meant. That's Kelly Ryan's own broker. Century & Lloyds' own 36 witnesses said this is what it meant. There is no dispute in the record. This was the MBL endorsement. It was not intended to cover this. Mr. Rione says, I didn't think it would cover this sort of operation. They didn't tell me about electrical wires. They didn't tell me they'd be unloading other vessels. The vessel being unloaded in this case was brought up there by an independent company. No relationship with Kelly Ryan. Mr. Okada was there because he was on another vessel. The day before, Kelly Ryan, as they usually did, had a shore-based employee, somebody who was not a seaman, unload these prefab houses, lift the wires, take them to the inland site. Today they couldn't find that person. It was the day of Mr. Okada's injury. They asked for volunteers. Mr. Okada said yes. They said we'll pay you some extra money. It's not disputed in the record. He did not have to do that. That was not part of his seaman's job. And that gets back to our point that this really was a workers' comp claim, and I'll get back to that in a minute. Before workers' comp qualified people had done the job, it was functionally indistinguishable, the job they were doing to what he did. He just happened to be there because of his association with the vessel. But to get back to your point, Your Honor, Mr. Rione would have charged a different premium if he'd accepted the risk at all, if he had been told a number of different things, including what they intended by the definition of unloading. As he said in his unrebutted declaration, this is an excess policy. I am covering all of Kelly Rione's risks. And related to the point you had asked about, Your Honor, the CGL policy does have a definition for unloading. That's an Alaska national policy, just as the MEL endorsement policy was Alaska national policy. There was one excess policy that sat as an umbrella over all of them. And in evaluating the risk, he says it's the custom for an excess underwriter to look at all the definitions and all the policies because that's the risk that they are insuring. And in this case, no one at Kelly Rione said they intended a definition different than loading and unloading that's in the CGL policy, which just coincidentally happens to be to define loading and unloading in the same way that the maritime professional insurance experts said it is typically understood in the maritime industry. So whether you apply state law or maritime law, I think you'll find extrinsic evidence will establish that everyone believed it meant the same thing in the context of this case, which is different from auto cases because you can look at Fiscus and you can look at McDonald, the cases that Century and Lloyds rely on, and in those cases, there's no extrinsic evidence that resolves the matter. And so the Court says, well, it's ambiguous because I haven't been able to resolve it. There's no extrinsic evidence. So I'm just going to apply the complete operation doctrine. The facts here are really quite different. At a minimum, they're different enough that there shouldn't have been a summary judgment entered on the matter. It's a matter that should have gone to trial. Roberts. Is that your position here, that there should be a trial on the question of whether unloading? If the Court were to reverse the summary judgment in Royal's favor on Uber May the day, then, yes, I believe there should be a trial on the two issues we've appealed, which is whether the workers' comp exclusion applies and whether this is loading and unloading. Frankly, I think a summary judgment motion should have been entered in our favor because the extrinsic evidence was unrebutted and undisputed. And based on that evidence ---- That's what your position was all the way along. Excuse me? I thought that was your position. It is. Not that ---- At a minimum, I want a trial. But I believe that actually I should have been granted the summary judgment motion because there was no conflicting evidence. All there was was Ryan Please's declaration after the fact, which was inconsistent with his deposition testimony, that in his mind he thought perhaps it would cover loading and unloading. But you read it very carefully. It's very clear. He never communicated that to anyone. And, indeed, his broker said, that's not something they ever told me because we didn't believe that's how these policies would work. So our first position is, yes, we believe we should have been granted summary judgment on that. Our second position is, if not, at a minimum, we should have been given a trial on it. Let me ---- if there's one thing I'm trying to understand here in this, all this insurance, what risk was really insured here? Under the MEL endorsement? Yeah. Yeah. I couldn't quite ---- Well, you've probably asked yourself, why would Royal not charge a premium? You know, people generally don't give things away, and certainly insurance companies don't. And that's because, based on the disclosures and the way these workers' comp policies apply, there was no belief that there would ever be any exposure on an excess policy in these circumstances. And let me back up and just explain a little bit about how these policies apply, and then I think it will answer your question. Okay. I think the briefs didn't do a very good job of explaining to you how premiums are determined for workers' comp and maritime endorsement policies. In short, what happens with a policy like Alaska National is they charge a flat premium for the insurance in the first instance, for the workers' comp insurance or for an employer liability complement, which is part two of the policy. Then what happens is they classify the workers. So in this case, each worker, including Mr. Okada, was put into a job classification code. And because each job has a different risk, for example, somebody who's pulling weeds at Kelly Ryan's facility faces different risks than somebody like Mr. Okada bushwhacking in Alaska, that there are different risk factors that apply. And so what you do is you look at who's doing what job, some are riskier, and you pay a higher premium. And so there's a premium that's based on who's doing what kind of work. And this is very important for virtually every aspect in this case because both Kelly Ryan and Alaska National repeatedly classified Mr. Okada, even at the time of his injury, as being in job classifications which are subject only to part one of the Alaska National policy. That is job classifications that would trigger either workers' comp benefits in Alaska or longshoreman's benefits, which are also covered under part one of the Alaska policy. Let me help me out here. Just because Mr. Okada would be covered by workers' comp, why does it mean that he wouldn't also be able to recover under the Jones Act? There are exceptions where he could do both, Your Honor. He's not mutually exclusive. Typically it is. Typically somebody who has a claim in Alaska doesn't have a Jones Act claim. But there are exceptions, and we've cited the cases, which gets back to our position on the workers' comp exclusion. Just to sidetrack, I'll circle back in a minute, how those policies fit together is this way. The reason the part two policy has an exclusion for obligations payable in workers' comp, which by endorsement was expanded to include longshoreman's, is so that those people who have a workers' comp or a longshoreman claim and get that process will be paid for the injuries that are compensable under those schemes. Not all aspects of the injury are compensable under those schemes. So, for example, with Mr. Okada, he probably wouldn't be entitled to workers' comp pain and suffering damages under the Alaska State workers' comp program. So where would that go? That would go into part two. His wage loss and the other things compensable under workers' comp or longshoreman would be paid under part one. What remained, if he had a viable Jones Act claim, would be these other things that he perhaps could get, and they would fall under that part two part of the policy, and there would be exposure there, and that's where those would get paid. In this case, Mr. Okada was never classified for any of the work that was covered by the MAL endorsement. That classification has a seven-series code. He had a five-series code not only prior to his injury, but even well into 2003 after everybody evaluated this issue again and again. Kelly Ryan and Alaska National continued to classify him as only being in a job that was subject to part one of the policy, and so course of dealing, uses of trade, all established, in addition to the testimony of the insurance professionals and Kelly Ryan's own broker, that this was not an injury that was supposed to be covered under the loading and unloading MAL endorsement. The evidence is undisputed on that. And so a premium never got paid to cover Mr. Okada under the MAL endorsement. Alaska National got premiums, but for work that he was doing under the workers' comp code and for under the longshoreman's act. So what was the very narrow risk, then, that they were insuring? And so circling back, and I forgot your question. I want to make sure I understand all this. In Mr. Rione's declaration, you'll see he identifies how the MAL endorsement was intended to work and what it was intended to cover. First, there's an exclusion for claims covered by protection and indemnity policies. Second, if there's a claim that survives that exclusion, there's an exclusion for obligations that should be paid under the workers' comp laws. In this case, the word is exclusion, not obligated to pay. And if you'll actually look at the insurance policy, the insurance company knew how to use the terms differently. There are places in the policy where it says we will pay if you become obligated to pay. In the exclusion, it doesn't say obligated to pay. It says exclusions. And that's so that you can't have what happened here happen, which is there was a portion of the policy that shouldn't have had it. So, first, there's no coverage for a P&I claim, protection and indemnity claim, no coverage for a workers' comp claim, no coverage for a longshoreman's claim. And so if you've got a worker who can't recover under any of that, and he's involved in loading and unloading vessels or painting or scraping the decks, that's what's being covered. And that's why there was no premium, because at the time, Kelly Rione had nobody doing that work. Okay. All right. So they really didn't anticipate any risk here? They didn't. Zero, Your Honor. Everybody was stunned. Frankly, all the insurance professionals were stunned that it would even get here. I mean, honestly, notwithstanding the ruling of this Court on the protection and indemnity issue in the first instance, most of the marine people thought that's where this should have fallen, because in the past, the protection and indemnity people had paid for claims like this. They had paid for a guy just like Mr. Okada in a vessel in Alaska delivering prefab homes who got injured on an ATV doing recreational stuff. And so the course of dealing in the history caused everyone to think it would fall there first. If it didn't fall there, it would fall under workers' comp. And indeed, in a request for admission, Kelly Rione admits that Mr. Okada's coworker, if he didn't have the Seaman's label, would most clearly get workers' comp benefits. Those would be exclusive. There wouldn't be Jones Act recovery in that situation. And also, one of the other professionals said, well, he sure looks like a longshoreman to me if he's unloading and loading vessels, and that's covered under Part 1. That's not covered under Part 2. If I could circle back and talk about Norfolk for a minute, unless you've got some other questions for me. Thank you. Candidly, what constitutes a maritime obligation is very confusing to me after looking at all these cases, and you can see the courts struggle with it, too. I don't believe that Norfolk necessarily overrules all aspects of the Simons case. I think Norfolk helps my position here. I don't think it undermines the paradigm where you attempt to determine whether a contract which is both a mixed contract, both maritime and non-maritime, whether you employ the severability or incidental standards. I think those still apply. I think what Norfolk does is expands the universe of contracts which are deemed to have maritime obligations and confer admiralty jurisdiction. Let me just ask a question about that. If you think severability still exists, how do you square that with Norfolk's primary objective test? I think it still exists for this reason. I think what Norfolk did in there was it looked at the entire contract in the first instance to see whether it was primarily maritime and concluded that it was, so it didn't have to get into the severability incidental test. Here, I think we need to get into that because there's no question that the Royal Umbrella policy had a large component of non-maritime risk, and that's fundamentally what it was designed to cover. But the MEL endorsement is severable from it, and under Norfolk, I think a fairer reading of Norfolk means that the MEL endorsement is a maritime obligation, which by itself, if it's severable, would create admiralty jurisdiction. Because as in Norfolk ---- It's the primary objective of the whole policy, which appears to be non-maritime. Well, I read Norfolk to mean here's the test to be applied to determine whether something is primarily a maritime obligation. And so you would look at the overall policy, and applying Norfolk, you would conclude if you looked at the Royal policy entirely, in its entirety, that this is not primarily a maritime obligation. Indeed.  I think we would all agree on that. I don't think it then eliminates the next step, whether the maritime obligations, which I think Norfolk would conclude exist with regard to the MEL endorsement, are severable or incidental to the non-maritime aspects for the purposes of conferring admiralty jurisdiction. And I think the MEL endorsement is severable because it was negotiated separately, and as I've just explained, separate premiums are calculated for that. This isn't a one-premium policy. Although in Folks America, which is a case that applied Norfolk to an insurance contract and found it was an admiralty jurisdiction, the Court said even if there is one premium, that doesn't mean admiralty jurisdiction doesn't apply to an insurance contract. After getting the Court's order yesterday, I looked to see what courts have followed Norfolk and whether any have applied it in a context like this, in a case called Folks America Reinsurance Company at 413-307. The Court there had to deal with an insurance policy, not substantially unlike ours, but in a way that helps us significantly. The policy, there was a CGL policy. It wasn't even a maritime endorsement policy. The Court applied Norfolk there and said that CGL policy contains enough maritime obligations to confer admiralty jurisdiction in light of Norfolk. And so I think based on Folks America and Norfolk, the MEL endorsement is one severable and two maritime obligation that confers admiralty jurisdiction. Would you submit that case to the clerk so that we would have copies of it, please? The clerk will provide you with government sheets to do it. Okay. We'd gladly do it. Because I take it that was not, since Norfolk wasn't cited in your brief, that that case was not cited. No. This is a Second Circuit case, and we'd be happy to provide it. Thank you. It's a 2005 case. If I might just respond to one other question that you had asked, which was the question of if there's not admiralty jurisdiction, is there jurisdiction to resolve this dispute? That's a good question, and the answer is unclear because of the procedural history of this case. When this case first came to this Court, Royal was not a party. We were not added until after that decision. What gave this Court jurisdiction in the first instance was the protection and indemnity policy. Century & Lloyd's has taken the position that since this Court's ruling, that policy was out of the case. It then sued Royal. And so I think it's an interesting question whether they can have supplemental jurisdiction over Royal in a situation in which the basis for their original jurisdiction, they believe, was resolved and was out of the case before they amended it. But when they filed this case, there was admiralty jurisdiction. There certainly was. And all along the way, the district court could add parties, delete parties. Certainly not. And the question is, at the time this one was added, did there remain anything that conferred admiralty jurisdiction other than the MOU? Well, all we said was that it didn't, that there wasn't coverage under that policy. Not that there wasn't an admiralty claim. Exactly. You did not say that. You're correct, Your Honor. Thank you very much. Your Honor, I'd like to address some of the issues that were raised here. First of all, the way this policy works, the way the MEL policy works, James Okada received his crew time and daily rate to work on the tug at Casey Marie. He also received cargo time, which he got for loading and unloading. That portion of his policy was intended to be reported to Alaska National, and they paid premium on that portion. Royal is not the MEL carrier here. They are the excess carrier. As the excess carrier, they have no right to tell Kelly Ryan or Alaska National what that policy means, what the MEL policy means. The idea of transferring the definition from a CGL policy to a MEL endorsement is just, there's no ordinary purchaser of insurance that would assume that a policy that he purchases over here, definitions in that insurance policy, rule in this instance. Once again, Royal is trying to rewrite the policies by claiming that there was no premium paid. There was premium paid for all the risks under the insurance policy. Royal's premium was a flat rate, $17,000. That was a flat rate. In terms of their arguments regarding Bray Fide, the fact of the matter is, Kelly Ryan explained to Royal what they were doing. They were pre-manufacturing housings in CL. They were shipping them to Alaska. They were unloading them. They were installing them at their final location. Like Royal says, it was undisputed that if a Kelly Ryan employee went aboard the house rather than James Okada, a seaman, that there would be coverage. Likewise, if a child or a contractor went aboard that house, the MEL policy at the Royal excess policy would respond to that injury. Finally, I'd like to point out. The problem I have with that is that Kelly Ryan didn't disclose that the employees were routinely handling high-voltage electric wires and working on vessels not owned by Kelly Ryan. Do you think that's relevant? Well, first of all, I don't think it's relevant because I think the fact of the matter is that it's not a marine insurance policy, the Royal policy, and therefore the doctrine of Mubarek Fide is not implicated. Under Washington law, the test is, was there a material misrepresentation? There's no issue there that there was any misrepresentation made to Royal, and that's an issue that that, frankly, has not been briefed that they argue that it is. Second of all, the doctrine doesn't require that you explain every single thing that a person's going to do. You generally just have to describe your operations, which is what they did. They described the fact that they moved houses to Alaska. They took the Alaskans, the houses off the barge, and then moved them to the final location and installed them. If the doctrine applies, does it mean that the, I guess here the insurer, the excess insurer, the primary, the base insurer, do they have any obligation to the insurer to inquire? I do believe they have an obligation to inquire. If they are told how, what operations are happening, they have a duty to inquire if they need additional information regarding those operations. You have to remember, Royal is not just insuring the loading and unloading. They're insuring all of Kelly Ryan's obligations, all of Kelly Ryan's operations as a hotelier, as a construction company. As a construction company, people are going to be working around electricity. I guess that Century Select should have been sharp enough to figure out that they were going to have to move. I'm sorry, Century Select? I forget which one it is. Alaska National. Alaska National. Well, Alaska National is a much different issue in that Alaska National audited Kelly Ryan on a regular basis to determine premiums that were going to be paid, what the employees were doing. There was a lot more connection there. If Royal had questions, they should have asked Alaska National what was meant by the MEL policy, what it covered and what it didn't cover. Frankly, this argument that because James Okada could claim broker compensation  fact of the matter is the MEL policy is written so that it specifically covers this type of situation. Okay. We'll let you go over your time. Thank you very much. We appreciate both arguments in this case. Very helpful.
judges: D.W. Nelson, Thompson, Paez